**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES SECURITIES AND**
**EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**JORDAN MEADOW and STEVEN**
**TEIXEIRA,**

**Defendants.**

**COMPLAINT**

**JURY TRIAL DEMANDED**
**Civil Action Number:  23-cv-05573**

---

Plaintiff United States Securities and Exchange Commission (the "Commission"), for its

Complaint against Defendants Jordan Meadow ("Meadow") and Steven Teixeira ("Teixeira"),

alleges as follows:

## SUMMARY

1.      This action concerns the Defendants' insider trading in the securities of several

issuers based on material nonpublic information Teixeira misappropriated from his romantic

partner's laptop while they both worked from home during the COVID-19 pandemic.

2.      Teixeira lived and had a romantic relationship with an executive assistant (the

"Executive Assistant") who worked at a New York-based investment bank (the "Investment

Bank") during the relevant period.

3.      From in or about late 2020 through in or about May 2022, Teixeira

misappropriated material nonpublic information from the Executive Assistant's laptop as she and

Teixeira both worked from their shared apartment.

4.      The information Teixeira misappropriated related to mergers and acquisitions

involving the Investment Bank and its clients.  On the basis of this material nonpublic

information, Teixeira bought call options on numerous securities, including the securities of Domtar Corporation ("Domtar"), Proofpoint, Inc. ("Proofpoint"), Score Media and Gaming, Inc. ("Score"), and VMWare, Inc. ("VMWare").  Teixeira's illicit profits on these trades exceeded $28,000.

5.      Teixeira shared the material nonpublic information that he misappropriated.  He unlawfully communicated it to several of his friends, including a particular close friend ("Individual 1"), so that they too could profitably trade on the misappropriated information.

6.      Teixeira and Individual 1 also tipped material nonpublic information to Meadow. Meadow, who was at relevant times a registered representative at a New York-based registered broker dealer (the "Brokerage Firm"), offered to compensate them for the information with Rolex watches.

7.      Armed with material nonpublic information that he knew Teixeira had misappropriated, Meadow traded in, among others, securities of Score and VMWare in his own account.  Meadow's illicit profits on these trades totaled more than $730,000.

8.      Meadow also used Teixeira's misappropriated information to recommend profitable trades to his brokerage customers.

9.      For example, Meadow recommended investments in Score to his brokerage customers with the knowledge—from misappropriated information taken from the Executive Assistant's laptop—that Score would soon be acquired.

10.     Meadow meanwhile shared information about Score with his colleague ("Broker 1"), another registered representative at the Brokerage Firm.  As a result, Broker 1 traded Score securities in his own account and recommended Score to his brokerage customers.

11.     Together, customers of Meadow and Broker 1 made millions of dollars on timely trades in securities of Score, while Meadow and Broker 1 also made hundreds of thousands more in commissions.

## **VIOLATIONS**

12.     Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by engaging in the conduct this Complaint describes.

13.     Defendants will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object, unless they are restrained and enjoined.

## **NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

14.     The Commission brings this action pursuant to Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)], 21(e) [15 U.S.C. § 78u(e)] and 21A(a) [15 U.S.C. § 78u-1(a)].

15.     The Commission seeks a final judgment (a) permanently enjoining Defendants from violating Section 10(b) of the Exchange Act or Rule 10b-5 thereunder; (b) ordering Defendants to disgorge ill-gotten gains they received as a result of the violations this Complaint alleges, and to pay prejudgment interest pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-l]; (d) prohibiting Defendants from serving as officers or directors of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)] pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e) and 78aa].

17.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa.  The Defendants may be found or transact business in the Southern District of New York, and certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Southern District of New York.

## DEFENDANTS

18.     **Jordan Meadow**, age 34, lives in Warren, New Jersey.  He has served as a registered representative of the Brokerage Firm since in or about 2018.  Individual 1 introduced Meadow to Teixeira.

19.     **Steven Teixeira**, age 32, is a resident of Queens, New York.  He was, at relevant times, employed by an international payment processing company as its Chief Compliance Officer, and was a certified anti-money laundering specialist.

## OTHER RELEVANT INDIVIDUALS AND ENTITIES

20.     **Individual 1** was, at relevant times, a friend of Teixeira and Meadow.

21.     **Broker 1** was, at relevant times, a co-worker of Meadow at the Brokerage Firm, where Broker 1 was also a registered representative.  Broker 1 and Meadow shared an office, worked from the same room, and frequently communicated with one another including in person, on the phone, and via text message.

22.     **Executive Assistant** was, at relevant times, employed by the Investment Bank as an executive assistant.  At the Investment Bank, the Executive Assistant was responsible for, among other things, scheduling meetings of the Investment Bank's valuation and fairness

4

committees concerning potential transactions involving the Investment Bank's clients.  The Executive Assistant had access to material nonpublic information relating to dozens of the Investment Bank's deals.

23.     **Investment Bank** is a U.S.-based investment bank and financial services company headquartered in New York, within the Southern District of New York.

## COMMONLY-USED TRADING TERMS

24.     A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike" price) prior to the expiration date.  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.

25.     A "call" option gives the purchaser-holder of the option the right, but not the obligation, to purchase a security at a specified strike price within a specific period of time. Generally, the buyer of a call option anticipates that the price of the underlying security will increase during that period of time.

## FACTS

I.     **Teixeira Accessed the Investment Bank's Material Nonpublic Information**

26.     The Executive Assistant worked for the Investment Bank from in or about 2014 through in or about February 2023.

27.     The Executive Assistant had two primary responsibilities at the Investment Bank. First, she supported several investment bankers.  Second, she was responsible for scheduling valuation and fairness committee meetings for the Investment Bank.  These meetings related to confidential potential transactions involving the Investment Bank's clients, including potential mergers and acquisitions of publicly traded companies.

28.     Several bankers whom the Executive Assistant supported shared their Microsoft Outlook calendars with her.  The bankers' calendar items were thus visible within the Executive Assistant's Outlook.  Accordingly, anyone with access to the Executive Assistant's Outlook account would also have access to the calendars and calendar items of these bankers.

29.     Deal teams working on transactions provided the Executive Assistant with scheduling request forms for valuation and fairness committee meetings.  These forms included the names of the companies participating in, and the material terms relating to, the proposed deals.  The Executive Assistant created and sent calendar invitations for the meetings, attaching the scheduling request forms to the invitations.

30.     The Executive Assistant lived at relevant times in an apartment in Queens, New York that she shared with Teixeira.

31.     The Executive Assistant and Teixeira shared confidences, including about their relationship, their families, and their work and careers. The Executive Assistant trusted Teixeira to maintain those confidences, and Teixeira knew that the Executive Assistant expected him to keep the information confidential.

32.     The Executive Assistant worked from the Queens, New York apartment she shared with Teixeira starting in or about July 2020 and continuing into 2021. The Executive Assistant accessed her work files and the Investment Bank's Outlook application from home by logging into the Investment Bank's computer system via her personal laptop.

33.     The Investment Bank's online portal for employees working remotely locked automatically after a period of inactivity.  The system could detect that an employee was not typing or moving their mouse, for example, and would require the employee to log in again to access the Investment Bank's files.

34.     The Executive Assistant often left the apartment she shared with Teixeira during the workday or otherwise left her laptop unattended.

35.     Teixeira was familiar with the Executive Assistant's work-from-home routine.  In particular, Teixeira was aware that the Executive Assistant left her laptop unattended at their apartment during the workday.

36.     Teixeira provided the Executive Assistant with a device that moved the Executive Assistant's mouse while she was away from her computer.  This device simulated user activity and prevented the Investment Bank's online portal from detecting that the Executive Assistant was away from her computer, which would otherwise cause the system to lock and require the Executive Assistant to log in to access the Investment Bank's files.

37.     The Executive Assistant asked Teixeira to check her work email while she was away during the workday, and to alert her if she received emails that required her attention.

38.     In providing Teixeira access to her laptop and work applications, the Executive Assistant trusted Teixeira not to access or misappropriate the Investment Bank's confidential information for his own benefit.

## II.     Teixeira Misappropriated the Investment Bank's Material Nonpublic Information and Shared it With Others

39.     In or about late 2020, Teixeira began misappropriating the Investment Bank's confidential information from the Executive Assistant's laptop for his own benefit.

40.     Teixeira accessed the Executive Assistant's laptop while she was away—either out of the room or away from the apartment entirely.  Using his access, Teixeira reviewed the Executive Assistant's Outlook application to find valuation and fairness committee meetings relating to mergers and acquisitions of public companies.  He then reviewed the attachments

containing the party names and material terms of potential transactions involving the Investment Bank's clients.

41.     Teixeira told others, including Individual 1 and Meadow, that he had access to material nonpublic information through his access to the Executive Assistant's laptop.  He told them that he did not have the Executive Assistant's permission to take the Investment Bank's information, and urged those who knew her not to tell the Executive Assistant about what Teixeira was doing with that information.

42.     Teixeira shared material nonpublic information that he obtained from the Executive Assistant's laptop with Individual 1, Meadow, and others so that they could trade on the basis of the information.

### III.   Teixeira Shared the Investment Bank's Misappropriated Material Nonpublic Information With Meadow

43.     Teixeira and Individual 1 discussed sharing the Investment Bank's material nonpublic information that Teixeira was obtaining from Executive Assistant's laptop with others.

44.     In particular, Teixeira and Individual 1 discussed sharing the information with Meadow because Meadow worked in the securities industry and might compensate Teixeira and Individual 1 for providing him the material nonpublic information Teixeira obtained.

45.     In or about March 2021, Teixeira, Meadow, and Individual 1 drove together from New York to Hoboken, New Jersey.

46.     The three of them discussed their insider-trading scheme during their drive.

47.     Teixeira explained during the drive that he was in a romantic relationship with the Executive Assistant and that the Executive Assistant worked for the Investment Bank.

48.     Teixeira also told Meadow during the drive that Teixeira could obtain the Investment Bank's confidential merger and acquisition information regarding public companies

by accessing the Executive Assistant's laptop, without the Executive Assistant's knowledge, when she left it unattended in their apartment.

49.     As noted above, Teixeira explained to Meadow that he did not have the Executive Assistant's permission to take the Investment Bank's information or to share that information with others.

50.     Teixeira further provided Meadow with material nonpublic information about a potential transaction involving Domtar that he had surreptitiously obtained from the Executive Assistant's laptop.

51.     Around this time, Meadow agreed to compensate Teixeira and Individual 1 for providing him with the Investment Bank's material nonpublic information by buying Teixeira and Individual 1 Rolex watches.

**IV.     Insider Trading in Domtar Securities**

52.     At relevant times, Domtar traded on the New York Stock Exchange and the Toronto Stock Exchange under the ticker symbol "UFS."

53.     On or about March 10, 2021, the Executive Assistant received a request to schedule a valuation committee meeting relating to Paper Excellence's potential acquisition of Domtar.  The scheduling request form indicated that the potential transaction would be worth $2.8 billion and would be announced in the second quarter of 2021.  At the time, Domtar was worth about $1.9 billion and its stock traded at about $38 per share.

54.     The Executive Assistant sent a calendar invitation for the meeting on or about March 11, 2021.

55.     Teixeira accessed and used information concerning the Domtar transaction from the Executive Assistant's laptop without her or the Investment Bank's permission to do so.

56.     On March 15, 2021, based on the information that he had secretly obtained from the Executive Assistant's laptop, Teixeira bought five Domtar call option contracts with a strike price of $45 and an expiration date of April 16, 2021.

57.     On or about March 19, 2021, during their drive to Hoboken with Individual 1, Teixeira provided Meadow with information about the Paper Excellence/Domtar transaction.

58.     The Paper Excellence/Domtar transaction was not announced before Teixeira's call options expired out of the money on April 16, 2021.

59.     However, on or about April 25, 2021, the Executive Assistant received a request to schedule a fairness committee meeting relating to Paper Excellence's potential acquisition of Domtar.  According to information in the form the Executive Assistant received and attached to the calendar invitation she sent the next day, the deal had an estimated value of $2.8 billion and was set to be announced on May 3, 2021.  Domtar shares were then trading at about $39.

60.     Teixeira accessed and used this information from the Executive Assistant's laptop without her or the Investment Bank's permission to do so.

61.     On April 29, 2021, Teixeira purchased two Domtar call option contracts with a strike price of $40 and an expiration date of May 21, 2021.

62.     On May 3, 2021, Bloomberg publicly reported that Paper Excellence was exploring a deal to acquire Domtar.  Domtar stock opened the next day at $48 per share, an approximately 18% increase from its May 3, 2021 closing price of $40.52.

63.     On May 4, 2021, Teixeira sold one of his option contracts and purchased three more call option contracts with a strike price of $55 and two call option contracts with a strike price of $55.  All five contracts had May 21, 2021 expiration dates.

64.     On May 11, 2021, prior to the market opening, Paper Excellence announced that it was acquiring Domtar for $55.50 a share, prompting Domtar shares to reach a high of $55.45 per share, a premium of approximately 37% over the May 3, 2021 closing price.

65.     Teixeira sold the remainder of his holdings, realizing $1,849 of illicit profits by trading based on the material nonpublic information he misappropriated from the Executive Assistant and the Investment Bank.

66.     On May 18, 2021, Meadow texted Teixeira, "Yo you see UFS [Domtar] . . . feed me."  Teixeira responded via text, "Lmso [laughing my socks off]."

**V.     Insider Trading in Proofpoint Securities**

67.     At relevant times, Proofpoint traded on the NASDAQ Global Select Market under the ticker symbol "PFPT."

68.     On or about April 19, 2021, the Executive Assistant received a request to schedule a valuation committee meeting relating to Thoma Bravo, LP's interest in acquiring Proofpoint.  According to the scheduling request form the Executive Assistant received, the deal would be worth approximately $11 billion and was set to be announced on April 26, 2021.  At the time, Proofpoint's market capitalization was approximately $9.44 billion, and its stock traded at approximately $135 per share.

69.     Teixeira accessed and used information about the Thoma Bravo/Proofpoint transaction from the Executive Assistant's laptop without her or the Investment Bank's permission to do so.

70.     On April 22, 2021, Teixeira purchased two Proofpoint call option contracts with a strike price of $155 and an expiration date of May 31, 2021.

71.     On April 26, 2021, prior to market opening, Proofpoint announced that it had entered into an agreement to be acquired by Thoma Bravo for approximately $12.3 billion, or approximately $176 per share.  Proofpoint shares opened at $174 per share following this announcement, an approximately 32% increase over the prior trading day's closing price.

72.     Teixeira sold his contracts that day, netting illicit profits of $3,530.

## VI.     Insider Trading in Score Securities

73.     At relevant times, Score traded on the Toronto Stock Exchange and the NASDAQ Stock Market under the ticker symbol "SCR."

74.     On or about July 23, 2021, the Executive Assistant received a request to schedule a valuation committee meeting relating to Penn National Gaming's interest in acquiring Score for $36 per share, with an expected announcement date of August 5, 2021.  At the time, Score was trading at about $15 per share.

75.     The Executive Assistant sent a calendar invitation for the meeting on July 26, 2021, attaching a scheduling request form containing the expected announcement date and value of the deal.

76.     Teixeira accessed this material nonpublic information from the Executive Assistant's laptop without her or the Investment Bank's permission to do so, and shared it with others, including Individual 1.

77.     In one or more communications on or after July 26, 2021, Individual 1 shared this material nonpublic information regarding the Score transaction with Meadow.

78.     During the afternoon of July 29, 2021, Teixeira and Individual 1 talked on the phone for about seven minutes.

79.     Shortly thereafter, Teixeira bought six Score call option contracts with a strike price of $17.50 and one Score call option contract with a strike price of $20.  All seven contracts expired on August 20, 2021.

80.     During the morning of July 30, 2021, Teixeira and Individual 1 spoke on the phone for approximately 38 minutes while the Executive Assistant was away from the apartment she shared with Teixeira.

81.     Shortly after getting off the phone with Teixeira, Individual 1 talked on the phone with Meadow for about 10 minutes.

82.     The same day, Meadow's brokerage customers began purchasing Score equity based on Meadow's recommendation.

83.     Meadow and Broker 1 discussed Score in one or more communications, including discussions about recommending that their brokerage customers purchase Score stock.

84.     On Sunday, August 1, 2021, Meadow and Broker 1 spoke on the phone for approximately 19 minutes.

85.     The next morning, Monday, August 2, 2021, Broker 1 started purchasing Score call option contacts in his own account.

86.     Additionally, an account in the name of Broker 1's wife purchased Score call option contracts and Score stock.

87.     Based on the recommendations of Meadow and Broker 1, brokerage customers of Meadow and Broker 1 also purchased shares of Score.

88.     On August 2, 2021, Teixeira purchased four Score call option contracts with a strike price of $17.50, one Score call option contract with a strike price of $20, and four Score

call option contracts with a strike price of $22.50.  All nine contracts expired on August 20, 2021.

89.     Later on August 2, 2021, following another call with Broker 1, Meadow purchased 112 Score call option contracts with a strike price of $20 and an expiration date of September 17, 2021, along with 489 Score call option contracts with a strike price of $22.50 and an expiration date of August 20, 2021.

90.     Meadow continued his purchases on August 3, 2021.  That day he purchased 218 additional Score call option contracts with a strike price of $20 and an August 20, 2021 expiration date.

91.     By the close of business on August 4, 2021, Meadow and Teixeira's Score holdings consisted of:

| Trader | Securities | | | Cost Basis |
|---|---|---|---|---|
| Steven Teixeira | 15 | 8/20/21 | $17.50 calls | $1,151 |
| | 2 | 8/20/21 | $20 calls | |
| | 4 | 8/20/21 | $22.50 calls | |
| Jordan Meadow[1] | 489 | 8/20/21 | $22.50 calls | $33,709 |
| | 218 | 8/20/21 | $20 calls | |
| | 62 | 9/17/21 | $20 calls | |

92.     Additionally, by the close of business on August 4, approximately 60 brokerage customers of Meadow and Broker 1 had purchased a combined total of over 300,000 shares of Score at a cost of over $6 million.

93.     On August 5, 2021, before the markets opened, Penn National and Score announced that they had entered into an agreement whereby Penn National would acquire Score for approximately $2 billion in cash and stock.

---

[1] On August 4, 2021, Meadow sold 50 of his September 17, 2021 $20 contracts.

94.     That day, Score's stock opened at $29.55 per share, rose as high as $33.22, and closed at $32.64, a nearly 80% increase from the prior day's closing price.

95.     Teixeira and Meadow then sold their Score call options, realizing $23,253 and $637,491 in illicit profits, respectively.

96.     Broker 1 and his wife also sold their Score options, netting trading profits of over $484,000 and over $15,700, respectively.

97.     Based on Meadow's and Broker 1's recommendations to buy Score stock, their brokerage customers made approximately $5 million in profits, while the two brokers received hundreds of thousands of dollars in commissions.

## VII.    Insider Trading in VMWare Securities

98.     At relevant times, VMWare traded on the New York Stock Exchange under the ticker symbol "VMW."

99.     In or about late 2021, a technology company ("Company A") engaged the Investment Bank regarding Company A's interest in acquiring VMWare for more than $60 billion.  At the time, VMWare's market cap was approximately $50 billion.  The Investment Bank held a valuation committee meeting regarding this transaction in January 2022.

100.     Although the Executive Assistant did not send out the calendar invitation for the meeting, bankers that the Executive Assistant supported were invited to attend.  Accordingly, the meeting's Outlook calendar item—with the attachment containing the deal's material terms— appeared in the Executive Assistant's Outlook calendar.

101.     Teixeira accessed this material nonpublic information from the Executive Assistant's laptop without her or the Investment Bank's permission to do so, and shared it with Individual 1.

15

102.     Individual 1 provided this material nonpublic information to Meadow.

103.     On March 3, 2022, Teixeira purchased one VMWare call option contract with a $145 strike price and an expiration date of July 15, 2022.

104.     Meadow began purchasing VMWare stock on or about May 9, 2022, as well as call option contracts beginning on May 10, 2022.

105.     On the morning of May 10, 2022, a purchase of VMWare call option contracts was initiated via a brokerage account in the name of Broker 1's wife.

106.     Broker 1 initiated his own purchases of VMWare call option contracts the next day, May 11, 2022.

107.     Meadow continued to trade VMWare securities through the next week.  By the close of business on May 18, 2022, Meadow held 1,000 VMWare shares, 50 call option contracts with a strike price of $110 and an expiration date of June 17, 2022, and 50 contracts with a strike price of $110 and an expiration date of July 15, 2022.

108.     Company A did not purchase VMWare.  However, Broadcom subsequently began exploring a similar transaction with VMWare.

109.     On Friday, May 20, 2022, VMWare shares closed at $95.71.

110.     On Sunday, May 22, 2022, Bloomberg publicly reported Broadcom's interest in VMWare.

111.     The next day, VWMare opened at $113.31 per share and closed at $119.43 per share, an approximately 24% increase from the May 20, 2022 closing price.

112.     Between May 23, 2022 and June 1, 2022, Meadow sold his VMWare holdings, obtaining illicit profits of $93,057.

113.    The VMWare trades in Broker 1 and his wife's accounts were also profitable,

netting $47,000 and $10,600 in trading profits respectively.

114.    Teixeira ultimately sold his VMWare call option contract at a loss, as the stock

never reached the contract's $145 strike price.

**VIII.    Meadow Attempted to Mislead FINRA**

115.    After the announcement of the Score transaction, the Financial Industry

Regulatory Authority ("FINRA") opened an investigation into Meadow's Score trading.

116.    Meadow provided sworn testimony to FINRA on January 19, 2022.

117.    Meadow did not testify truthfully to FINRA about his trading.  Among other

things, Meadow testified that he purchased Score options and recommended the stock to his

brokerage customers because of the legalization of single-game gambling in Canada and Score's

relatively low stock price.

118.    Meadow also testified that he talked to Individual 1 about Score because

Individual 1 is "into sports" and it is a "guy thing" to "talk about sports" and "sports betting."

119.    Meadow did not tell FINRA that Individual 1 had told him material nonpublic

information about an impending acquisition of Score.  Nor did Meadow tell FINRA that he had

received information misappropriated from an employee of the Investment Bank.

**IX.    Meadow Wanted More Material Nonpublic Information**

120.    In a conversation between Individual 1 and Meadow in January 2023, the two

discussed having obtained trading information from Teixeira's access to the Executive

Assistant's laptop, including information regarding Score and VMWare.

121.    Meadow and Individual 1 talked about how they had not received new

information from Teixeira in a while.

122.     Individual 1 told Meadow that the Executive Assistant had returned to working in the Investment Bank's office rather than working from home, thus limiting Teixeira's ability to access her laptop.

123.     Individual 1 also told Meadow that Teixeira had asked about the Rolex that Meadow had agreed to buy for him.  In response, Meadow claimed that his trading had not been lucrative because he had to pay taxes on the profits.

124.     Meadow told Individual 1 that he "just need[s] another, like, big score" to make some money.  Individual 1 said that Teixeira "needs to go through [the Executive Assistant's] laptop immediately" to obtain more material nonpublic information that he could trade on, and Meadow agreed.

125.     Meadow questioned whether Teixeira was trading on his own without sharing the information he was finding, asking Individual 1 whether Teixeira has "been flashing around cash?"  Individual 1 told Meadow that Teixeira was not.

**X.     Teixeira and Meadow Violated Federal Securities Laws**

126.     The Investment Bank's information concerning transactions involving, among others, Domtar, Proofpoint, Score, and VMWare was material and nonpublic.  A reasonable investor would have viewed this information as important to his or her investment decision and as significantly altering the total mix of information available to the public.

127.     Teixeira owed a duty of trust or confidence to the Executive Assistant by virtue of their relationship.

128.     As part of his relationship with the Executive Assistant, Teixeira's pattern, practice, and conduct gave the Executive Assistant comfort that Teixeira would treat information

related to her work as confidential and that Teixeira would not trade on it, use it for personal benefit, or share it with others.

129.    Teixeira also knew, was reckless in not knowing, or consciously avoided knowing that, based on their history, pattern, or practice of sharing confidences, the Executive Assistant expected that Teixeira would maintain the confidentiality of information related to the Executive Assistant's work, and not trade on it, use it for personal benefit, or share it with others.

130.    Teixeira purchased Domtar, Proofpoint, Score and VMWare securities for his own accounts while in possession and on the basis of material nonpublic information concerning these companies, and in breach of his duty of trust or confidence to the Executive Assistant.

131.    Teixeira also knowingly or recklessly tipped others, including Individual 1 and Meadow, concerning the Investment Bank's material nonpublic information in breach of his duty of trust or confidence to the Executive Assistant.

132.    Teixeira tipped these individuals for personal benefits, including the benefit of making a gift of material nonpublic information to a friend, and—with respect to his tips to Meadow—in expectation of receiving compensation from Meadow.

133.    Teixeira intended for others, including Individual 1 and Meadow, to trade on his tips, and knew or recklessly disregarded that the recipients of the information, including Individual 1 and Meadow, would use the information to trade securities.

134.    Meadow knew or was reckless in not knowing that the information he obtained from Teixeira and Individual 1 was material and nonpublic, including because Teixeira had told him the source of the information.

135.    Meadow further knew, recklessly disregarded, or consciously avoided knowing that this material nonpublic information, including concerning the Domtar, Proofpoint, Score and

VMWare transactions referenced above, was obtained and conveyed in breach of Teixeira's relationship of trust and confidence with the Executive Assistant, or similar breach of a duty.

136.    Meadow and Teixeira, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

137.    Meadow nevertheless traded in, among others, Score and VMWare securities while in possession and on the basis of the material nonpublic information he obtained, directly or indirectly, from Teixeira.

## CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against Defendants Teixeira and Meadow)

138.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1-137, inclusive, as if they were fully set forth herein.

139.    By engaging in the conduct described above, Defendants, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of national securities exchanges, in connection with the purchase or sale of securities, knowingly or recklessly:

      a.    employed devices, schemes, or artifices to defraud;

      b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or

      c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

140. By reason of the foregoing, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

### **I.**

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### **II.**

Prohibiting Defendants from serving as officers or directors of any entity having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

### **III.**

Ordering Defendants to disgorge all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

### **IV.**

Ordering Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

## V.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

<div style="margin-left: 45%;">

Respectfully submitted,

 S/Spencer Willig

Joseph G. Sansone
Scott A. Thompson
Julia C. Green
Gregory R. Bockin*
Norman P. Ostrove
Spencer Willig
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(267) 602-2138 (Willig)
WilligS@sec.gov

*Pending admission pro hac vice

</div>

Date:   June 29, 2023